# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TWILA SMITH, et al.,

    Plaintiffs,

    v.

ERGO SOLUTIONS, LLC, et al.

    Defendants.

Civil Action No. 14-382 (JDB)

## <u>MEMORANDUM OPINION</u>

Plaintiffs Twila Smith and Deirdra Gilliam Osborne filed this action against their former employer, Ergo Solutions, LLC ("Ergo"), and one of Ergo's owners,[1] George Brownlee, alleging sexual harassment. They seek equitable relief and damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the District of Columbia Human Rights Act (the "DCHRA"), D.C. Code § 2-1401 et seq. The parties have filed cross-motions for summary judgment. See Pls.' Mem. in Supp. of Their Mot. for Summ. J. ("Pls.' Mot.") [ECF No. 87–1]; Defs.' Opp'n to Pls.' Mot. for Summ. J. & Defs.' Cross-Mot. for Summ. J. ("Defs.' Opp'n & Mot.") [ECF No. 100]. Plaintiffs have also moved to strike two affidavits that defendants proffered in support of their motion for summary judgment. See Mot. to Strike [ECF No. 111]. For the reasons explained herein, the Court will deny plaintiffs' motions and grant in part and deny in part defendants' motion.

---

[1] Brownlee also held the title of chief operating officer ("CEO") for most of the time relevant to this lawsuit—until late 2009 or early 2010 when Ergo stopped having an executive board. George Brownlee Dep., Ex. 4 to Pls.' Mem. in Supp. of Their Mot. for Summ. J. [ECF Nos. 89-1, 89-2, 90-1] at 9:1–22, 20:1–12. His title then became "managing partner." Id.

## BACKGROUND

### I.        Ergo's Policies and Procedures

Ergo is a private health care services company with four owners.   George Brownlee 30(b)(6) Dep., Ex. 6 to Pls.' Mot. ("30(b)(6) Dep.") [ECF Nos. 91-1, 91-2, 92-1] at 20:13–22, 78:1–6; Brownlee Dep. at 80:1–4.   Beginning in 2007, Ergo had a formal employee policy and procedure manual, which included a "zero tolerance" sexual harassment policy.   Jerry Warren Dep., Ex. 3 to Pls.' Mot. [ECF No. 88-3] at 10:6–11:7, 18:12–19:13; 30(b)(6) Dep. at 93:12–94:3. Under that policy, sexual harassment complaints were to be directed to the complainant's direct supervisor or to a corporate compliance officer.   30(b)(6) Dep. at 120:21–121:4, 121:22–122:8. The complainant and alleged harasser were to be physically separated during an investigation into alleged conduct, and an employee could be suspended for violating the policy.   Id. at 131:1–11. The policy was revised in 2010.[2]   Ergo employees testified that they were aware of the policy and received some sexual harassment training.   Raphael Denbow Dep., Ex. 9 to Defs.' Opp'n & Mot. [ECF No. 100-10] at 16:3–17:1; Brooke Cawley Dep., Ex. 10 to Defs.' Opp'n & Mot. [ECF No. 100-11] at 9:15–11:16.

An investigation into other employees' sexual harassment allegations at Ergo in November 2009 concluded that sexual harassment was occurring at Ergo, notwithstanding its sexual harassment policy.   Hartman Letter Re: Investigation of Allegations of Potential Sexual Harassment ("Hartman Report"), Ex. 9 to Pls.' Mot. [ECF No. 93-1] at 1.   The report concluded that "[i]n light of the totality of the allegations, it is more likely than not that it would ultimately

---

[2] Jerry Warren served as Ergo's human resources director in 2007 and drafted the initial policy manual. Warren Dep. at 5:20–22, 8:21–11:7.   He was terminated in May 2010 and replaced by Richard Flanagan in June 2010. Richard Flanagan Aff., Ex. 8 to Defs.' Opp'n & Mot. [ECF No. 100-8] ¶ 1; Warren Dep. at 51:20–22.   Flanagan provided sexual harassment training to Ergo employees in September 2010.   Id. ¶ 2.   A formal complaint procedure also was added to Ergo's policy manual at some point after Warren left Ergo in 2010.   Warren Dep. at 20:14–22:20.

be determined that one or more Ergo employees actually was the victim of sexual harassment in the workplace." Id. at 6. The report also stated that "[c]learly, principals have felt little or no compunction about having operated outside the scope of Ergo's guidelines policies," and it "strongly recommend[ed] that Ergo revise its current sexual harassment policy." Id. at 7–8. Jerry Warren, Ergo's director of human resources from 2007 to 2010, also testified in his deposition that, during his time at Ergo, he observed sexual harassment in the workplace, including instances where a relationship that was initially consensual became nonconsensual and harassing. Warren Dep. at 47:7–48:18. Smith knew of the policy but observed that "the owners paid no attention to it in their conduct." Twila Smith Aff., Ex. 7 to Pl[s.'] Reply to Def[s.'] Opp'n to the Mot. for Summ. J. [ECF No. 109-1] ¶ 7. In contrast, Ergo co-owner Olu Ezeani testified that Ergo took sexual harassment complaints "very seriously." Olu Ezeani Aff., Ex. 2 to Defs.' Opp'n & Mot. [ECF No. 100-3] ¶ 6.

## II.     Facts Related to Twila Smith

Smith began working at Ergo in October 2005 as an occupational therapist. Twila Smith Dep., Ex. 1 to Pls.' Mot. [ECF No. 88-1] at 16:18–20. Smith alleged that Brownlee and a coworker named Marvin Fairclough[3] subjected her to sexual harassment during her employment at Ergo. Id. at 38:18–39:9.

### A.  Fairclough's Harassment of Smith

Fairclough began "touching and grabbing [Smith's] private parts" and "rub[bing] up against" Smith in 2008, and his behavior occurred "frequently" and continued throughout Smith's

---

[3] Documents in the record in this case alternatively spell this surname "Fairclough," "Faircloth," and "Fairclaw." Compare Smith Dep. at 39:2–6 ("Fairclough"); with Pl.[ Smith]'s Resps. to Def.'s 1st Set of Interrogs. ("Smith's Interrog. Resps."), Ex. 1 to Defs.' Opp'n & Mot. [ECF No. 100-2] at 6 ("Faircloth"); and Deirdra Osborne Dep., Ex. 2 to Pls.' Mot. [ECF No. 88-2] at 112 ("Fairclaw"). The Court will use "Fairclough" throughout this opinion.

time at the work site she shared with Fairclough.[4]  Id. at 171:20–173:3, 176:14–17.  Fairclough

also sent a picture of his penis to Smith's cell phone.  Id. at 173:19–174:4.  Smith noted that "his

behavior was consistent" in that he also groped and grabbed other women at their work site.  Id. at

176:14–177:9.  Smith never went out with Fairclough or sent any videos or photos to him via text

message.  Id. at 173:4–14, 176:9–13.  Smith was not aware of Fairclough ever being disciplined

for his behavior.  Id. at 176:20–22.

The parties dispute whether Smith ever complained of Fairclough's harassment.  Smith

stated that she complained about Fairclough to her supervisor, Brooke Cawley, "[m]ore than three

times," but nothing was done and eventually she "just stopped complaining."  Id. at 172:2–21.

Cawley stated that Smith never complained to him about sexual harassment and that he had never

heard about Smith being sexually harassed in the workplace until this litigation.  Cawley Dep. at

12:12–22.

### B.  Brownlee's Alleged Harassment of Smith

Smith and Brownlee agree that they had a relationship of a physical nature, beginning in

2006 or 2007 with what Smith characterized as "inappropriate touching or jokes and laughing it

off type of things."  Smith Dep. at 39:17–22, 40:22–41:9.  It is undisputed that over the years that

followed, Brownlee called and texted Smith on her cell phone, took Smith out to lunch, touched

Smith's genitals and breasts, grabbed her buttocks, and sent a photo of his penis to Smith's cell

phone.  Brownlee Dep. at 36:15–37:16, 43:8–14; Smith Dep. at 44:2–46:3, 62:10–64:16, 88:1–

91:4, 116:7–14.  In response, Smith sent photos of her breasts and leg to Brownlee's work email

in 2008.  Brownlee Dep. at 45:20–46:8; Smith Dep. at 116:15–22; 120:1–19.  Brownlee and Smith

---

[4] Because defendants have submitted no evidence to dispute Smith's description of Fairclough's conduct
towards her, the Court accepts Smith's account of Fairclough's conduct for purposes of summary judgment.

also visited a nightclub together, danced for approximately an hour, then moved to Smith's car, where they masturbated in each other's presence. Brownlee Dep. at 38:5–9; Defs.' Corrected Statement of Facts Not in Dispute ("Defs.' Statement of Undisputed Facts") [ECF No. 114-1] ¶¶ 24, 25; Smith Dep. 105:12–108:9.

The parties dispute whether some events happened as Smith has described them. Most notably, Smith testified that, while at a conference in Maryland on behalf of Ergo, Brownlee "tricked" her into walking into a stairwell; pushed her against a wall; said, "Come on, give me a kiss"; and then, over her objection, kissed her several times on the lips. Smith Dep. at 56:9–58:22. Brownlee denied that he ever attempted to kiss Smith. Brownlee Dep. at 38:10–21, 44:4–5.

The parties also dispute the voluntariness of Smith's actions. Smith stated that she never kissed Brownlee voluntarily, or voluntarily had any sort of physical relationship with him. Smith Dep. at 85:17–86:6; see also id. at 44:2–46:5; 86:9–18. Smith said that Brownlee's texts were "inappropriate" and that his frequent physical contact generally made her "uncomfortable." Id. at 62:10–64:16, 69:27–70:1, 75:2–10. Smith testified that Brownlee's sexual advances were unwanted; for example, when Brownlee attempted to touch her genitals while driving in the car on two occasions, she reported that she tried to pull his hand out of her pants. Id. at 93:18–95:7; see also id. at 100:1–12. Smith stated that "after a certain time" it became "too much" and that she "avoided him" at work. Id. at 64:11–16.

The parties also disagree about whether Smith reported Brownlee's behavior to others.[5] Smith testified that she complained verbally to Cawley, Ezeani, Warren, and another supervisor, Raphael Denbow. Smith Dep. at 59:5–22, 61:5–16, 64:22–65:12, 71:2–17, 77:11–13, 79:16–21,

---

[5] Recall that, during the relevant time, Brownlee was not just an owner of Ergo, but also the CEO (and later the "managing partner"). Brownlee Dep. at 9:1–22, 20:1–12.

80:9–81:4, 121:20–21.[6]  She believed that Denbow had also personally witnessed an incident in which Brownlee touched her genitals in public at a conference.  Id. at 82:14–22.  After many complaints, she concluded that it "was futile, so ultimately, [she] stopped complaining because [she] was getting backlash from it."  Id. at 77:7–10.

Cawley and Ezeani denied that Smith ever complained.  Cawley Dep. at 12:12–22; Ezeani Aff. ¶ 2.  Warren acknowledged that Smith told him that Brownlee had sexually harassed her, but only after Warren had left Ergo.  Warren Dep. at 54:13–55:17.  Denbow testified in his deposition that Smith never accused Brownlee of sexual harassment "in those words," but he recalled that Smith told him "George just grabbed me" in a "playful" manner at a conference.  Denbow Dep. at 20:16–21:14.

Finally, the parties dispute whether Smith faced work-related repercussions for refusing Brownlee's advances.  Brownlee never indicated that refusal to go to lunch, for example, would result in Smith being fired, being suspended, having her pay docked, or being denied bonuses, but Smith believed that he "implied" that she would not be promoted if she did not go to lunch with him.  Smith Dep. at 47:6–48:3.  Also, when she did not go to lunch with him she "would not be included in professional events and professional things" and was "isolated and alienated."  Id. at 48:13–18.  A month after Brownlee allegedly tried to kiss her in a stairwell, Smith traveled to Las Vegas for a professional event where Brownlee allegedly told her she could not participate in events with the Ergo group because he was "upset that [Smith] had complained to someone" about the kiss.  Id. at 55:1–56:3.

---

[6] Smith also stated in her deposition that Cawley recommended that she put the complaint in writing and direct it to an administrator or someone in human resources.  Id. at 71:5–72:1, 73:8–14.  Smith said that she complained "more than once in writing," including once in writing to Ezeani from Cawley's email.  Id. at 76:10–77:3.  However, Smith stated in her interrogatory responses that "[e]ach of her complaints were oral[,] and she did not submit a written complaint . . . because she believed that submitting a written complaint was futile."  Smith's Interrog. Resps. at 9.

Smith testified that Brownlee texted her asking for sex in 2010,[7] and she refused.  Id. at 125:2–126:6.  Approximately a week later, at some point in April or May 2010, Ergo suspended Smith for a week without pay, "supposedly" for allowing her occupational therapy license to expire.  Id. at 125:22–127:12.  Ergo then terminated Smith's employment a few months later, in July 2010, "allegedly for poor performance."  Smith Aff. ¶ 19; Smith Dep. at 18:1–7.  Defendants contend that Smith was suspended and terminated for legitimate reasons related to allowing her occupational therapy license to expire, failing to submit timely patient notes, and exhibiting unprofessional behavior.  Defs.' Statement of Undisputed Facts ¶¶ 29–32, 35, 52; Mem. Re: Twila Smith Termination, Ex. 12 to Defs.' Opp'n & Mot. [ECF No. 100-13] at 1.

## III.    Facts Related to Deirdra (Gilliam) Osborne

Osborne worked at Ergo as a speech pathologist from 2008 to 2011.  Osborne Dep. at 16:18–20, 21:1–5.  Like Smith, Osborne alleged that both Fairclough and Brownlee sexually harassed her during her time at Ergo.  Id. at 35:11–21.  Osborne resigned from Ergo in April 2011 to take a job for higher pay at another company.  Id. at 142:11–143:19.

### A.    Fairclough's Harassment of Osborne

Fairclough sexually harassed Osborne from June or July 2010, when they began working at the same facility, until October or November 2010, when Ergo transferred Fairclough to another facility.[8]  Id. at 112:22–114:4.  Fairclough "would stand purposefully in front of the door, when [Osborne] had to maneuver [her]self to get out of [it], and try to touch [her], . . . saying [in]appropriate, sexual things, [and] asking for [her] phone number."  Id. at 114:5–12.  He also tried once to kiss her while "blocking the doorway."  Id. at 116:16–22.  Fairclough also employed

---

[7] Brownlee denied texting Smith to ask for sexual intercourse.  Brownlee Dep. at 37:17–38:1.
[8] Because defendants have submitted no evidence to dispute Osborne's description of Fairclough's conduct towards her, the Court accepts Osborne's account of Fairclough's conduct for purposes of summary judgment.

"sexual innuendos," telling Osborne "how good it would be." Id. at 115:15–20. Osborne never went out with Fairclough, texted him, called him, or otherwise engaged in a relationship with him. Id. at 115:21–116:12. Osborne complained to Brownlee about Fairclough's harassment,[9] and Brownlee told her that Fairclough would be moved to a different facility. Id. at 120:14–122:3. After the transfer, Fairclough's harassment stopped. Defs.' Statement of Undisputed Facts ¶ 84; Osborne Dep. at 126:6–18.

### B. Brownlee's Alleged Harassment of Osborne

It is undisputed that Osborne and Brownlee had a sexual relationship and "went out . . . several times in 2010." Defs.' Statement of Undisputed Facts ¶ 87; see Osborne Dep. at 46:1–6, 97:13–20. The parties agree about some contours of this sexual relationship. For example, Brownlee called and texted Osborne on her cell phone, asked her out to lunch, and had sexual intercourse with her in her home three times. Brownlee Dep. at 49:22, 50:1–51:6; Defs.' Statement of Undisputed Facts ¶¶ 88, 91–93; Osborne Dep. at 66:11–68:12, 69:21–71:13, 74:4–75:12. Osborne sent Brownlee a photo of herself in a bikini, characterized as reciprocation for a photo of Brownlee's penis sent to her cell phone. Osborne Dep. at 43:11–18, 153:12–20; Defs.' Statement of Undisputed Facts ¶ 95. Osborne also manually stimulated Brownlee's penis in a movie theater. Osborne Dep. at 105:10–17, 110:7–15; Defs.' Statement of Undisputed Facts ¶ 96. However, the parties dispute whether Brownlee initiated sex acts with Osborne in the workplace. Osborne Dep. at 61:3–63:14; Brownlee Dep. at 53:5–8.

Although the parties agree that Osborne and Brownlee had a sexual relationship, they disagree about whether the relationship was coerced. For example, Osborne stated that if she failed

---

[9] The parties dispute whether Osborne also complained to Cawley or to Ergo's human resources director. Osborne Dep. at 119:2–8, 120:2–121:1, 122:4–5; Cawley Dep. at 15:4–11; Flanagan Aff. ¶ 8.

to answer Brownlee's calls or return text messages, Brownlee would respond, "How are you not going to answer my phone calls? I'm the CEO." Osborne Dep. at 77:6–9. Osborne also stated that Brownlee never directly threatened her job, but "he did possibly discuss a promotion with [her]," he threatened that he could move her "to another building" where she would not be able to do the type of work that she valued,[10] and she felt overall "very pressured . . . to submit to him." Id. at 73:16–74:1, 75:13–76:14. In contrast, Brownlee characterizes Osborne as a willing partner in their sexual relationship. Defs.' Opp'n & Mot. at 3–4.

Osborne complained about Brownlee to a supervisor, Brian Eft, but then told him not to forward the complaint to human resources, reasoning that "[i]f [she didn't] respond [to Brownlee's advances], maybe it will go away." Id. at 94:7–20. In late 2010, Osborne also mentioned being "uncomfortable" to Flanagan (without using Brownlee's name) but told Flanagan she did not want to formally lodge a complaint or to spur further investigation. Id. at 133:10–134:13, 135:14–136:12; Flanagan Aff. ¶¶ 5–7. Osborne testified that she also complained to Cawley, but he denied ever hearing a complaint from Osborne. Osborne Dep. at 128:6–132:19; Cawley Dep. at 15:4–11.

## IV. Procedural History

Smith and Osborne, along with another Ergo coworker who also alleged similar workplace misconduct,[11] filed a complaint and then an amended complaint in 2014. See Order, Apr. 6, 2016 [ECF No. 51] at 1. Smith, Osborne, and their co-plaintiff then moved to certify a class of Ergo employees subjected to sexual harassment. In March 2015, this Court denied in part and granted

---

[10] Osborne explained that she came to work "at a particular site, that hospital, . . . because [she] had wanted to work with a certain population" with "trachs and vents" (artificial airways) in order "to learn more about it." Osborne Dep. at 79:3–19. She stated that this experience was important to her, and that Brownlee stated that she could "possibly go to another building, if you don't like it here," which she interpreted as a threat to reassign her to a different facility if she did not have sex with him. Id. at 79:15–80:2.

[11] The third plaintiff, Alexis Dixon, settled her claims against Ergo and Brownlee and is no longer involved in this lawsuit.

in part defendants' motion to dismiss and denied plaintiffs' motion to certify the class pending further pre-certification discovery. <u>Smith v. Ergo Solutions, LLC</u>, 306 F.R.D. 57, 68 (D.D.C. 2015). Smith and Osborne filed a second amended complaint, discovery commenced, the parties attempted settlement discussions, and the case was administratively stayed for several months. Order, Apr. 6, 2016, at 1. Smith and Osborne's supplemental third amended complaint followed, whittling the claims down to quid pro quo and hostile work environment sexual harassment claims under Title VII against Ergo and under the DCHRA against Ergo and against Brownlee in his individual capacity.[12] 3d Am. Compl. [ECF No. 52] ¶¶ 80–110; Order, Apr. 6, 2016, at 2. The parties then engaged in a lengthy discovery dispute. <u>See</u> <u>Smith v. Ergo Solutions, LLC</u>, Civil Action No. 14-382, 2018 WL 5810836 (D.D.C. Nov. 6, 2018).

The parties have filed cross-motions for summary judgment, and plaintiffs have filed a motion to strike two affidavits that defendants offered in support of their combined motion for summary judgment and memorandum in opposition to plaintiffs' motion for summary judgment. These motions have been fully briefed and are now ripe for the Court's consideration.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion

---

[12] Supervisors are not liable in their individual capacity under Title VII, <u>Gary v. Long</u>, 59 F.3d 1391, 1399 (D.C. Cir. 1995); but they may be held individually liable under the DCHRA, <u>Purcell v. Thomas</u>, 928 A.2d 699, 715–16 (D.C. 2007). Therefore, to the extent plaintiffs' complaint seeks to bring Title VII claims against Brownlee in his individual capacity, such claims are not cognizable.

by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," which it believes demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); see also Celotex, 477 U.S. at 323.

In determining whether there exists a genuine dispute of material fact sufficient to preclude summary judgment, the Court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  Moreover, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249–50 (internal citations omitted).  Summary judgment, then, is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Although affidavits may support a party's motion for summary judgment, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . by, [for example] filing a later affidavit that flatly contradicts that party's earlier sworn deposition."  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999).  "A court may strike all improper portions of an affidavit used to support or oppose a motion for summary judgment."  Canady v. Erbe Elektromedizin GmbH, 384 F. Supp. 2d 176,

180 (D.D.C. 2005). "The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion," but such motions are generally disfavored. Id.

## ANALYSIS

Smith and Osborne bring a total of four claims. Smith alleges quid pro quo and hostile work environment sexual harassment under the DCHRA against Ergo and against Brownlee in his individual capacity (Count I), and quid pro quo and hostile work environment sexual harassment under Title VII against Ergo (Count II). 3d Am. Compl. ¶¶ 80–95. Osborne brings identical claims under the DCHRA (Count III) and Title VII (Count IV). Id. ¶¶ 96–110.

Each party moves for summary judgment on all claims, and plaintiffs also move to strike two affidavits that defendants offer in support of their summary judgment motion. The Court first addresses plaintiffs' motion to strike because this motion affects the evidence in the record for summary judgment.

### I.      Plaintiffs' Motion to Strike

Plaintiffs move to strike the affidavits of Olu Ezeani, an Ergo co-owner, and Richard Flanagan, Ergo's human resources director beginning in June 2010, arguing that neither affidavit was notarized and that defendants allegedly breached their "discovery obligations by failing to disclose the affidavits . . . [until] after the close of discovery." Mot. to Strike at 2. Plaintiffs also argue that Flanagan's affidavit is invalid because it failed to note that he did not work at Ergo until late 2010, which plaintiffs consider both "misleading" and "in contradiction with his prior sworn [deposition] testimony." Id. at 2, 5–6.

First, plaintiffs' argument that the affidavits are defective because they are not notarized is without merit. Local Civil Rule 5.1(f) and 28 U.S.C. § 1746 permit unsworn declarations to be used "with the same force and effect" of an affidavit so long as the declaration is signed and

12

"subscribed as true under penalty of perjury, and dated, in <u>substantially</u> the following form: . . . 'I declare . . . under penalty of perjury . . . that the foregoing is true and correct.'" LCvR 5.1(f) (emphasis added); <u>see</u> 28 U.S.C. § 1746. Here, each affidavit is signed and dated, and each includes language stating that the affiant "attests to the truth and accuracy of contents of this affidavit under penalties of perjury." Flanagan Aff. at 1; Ezeani Aff. at 1. Attesting to the "truth and accuracy of contents" of a statement "under penalties of perjury" is "substantially" the same form as declaring that the contents are "true and correct" "under penalty of perjury." <u>See</u> <u>United States v. 8 Gilcrease Lane, Quincy Fla. 32351</u>, 587 F. Supp. 2d 133, 139 (D.D.C. 2008). Hence, the affidavits—although more properly identified as "declarations" because they are unsworn—carry the same force and effect even though they are not notarized.

Plaintiffs' objection to defendants' failure to "disclose the affidavits" until after discovery closed is also without merit. Mot. to Strike at 2. Defendants had no obligation to disclose the affidavits. To the extent that plaintiffs' motion to strike describes the affidavits as independent documents subject to production during discovery, <u>see</u> Mot. for Sanctions at 3 ("No disclosure of an affidavit by Olu Ezeani . . . was made during the discovery period."), plaintiffs are mistaken; affidavits and declarations generally operate as a proxy for witness testimony that would be proffered at trial, not as documents subject to production in discovery. Defendants were obliged under Federal Rule of Civil Procedure 23 only to identify Flanagan and Ezeani as witnesses, and it appears that defendants did in fact disclose the identity of these witnesses before the end of discovery. <u>See</u> Def. Ergo Solutions, LLC's Objs. & Answers to Pl[s.'] 1st Set of Interrogs., Ex. D to Mot. to Compel Produc. of Docs. and Resp. to Interrogs. [ECF No. 64-4] at 4 (listing Ezeani and Flanagan as "persons hav[ing] knowledge of the facts related to allegations in Plaintiffs['] complaint"). Plaintiffs also took Flanagan's deposition, <u>see</u> Richard Flanagan Dep., Ex. 1 to Mot.

to Strike [ECF No. 111-1]; and had an opportunity to take Ezeani's deposition, <u>see</u> Scheduling Order, Oct. 6, 2016 [ECF No. 63] (ordering that all depositions, including those of "the three owners of Defendant Ergo Solutions," of which Ezeani was one, be completed by a certain date). Because defendants disclosed the witnesses before the close of discovery and were not required to produce the affidavits, the Court will not strike the affidavits on these grounds.

Additionally, plaintiffs' contention that Flanagan's affidavit should be struck because it "is in contradiction with his prior sworn [deposition] testimony" is without merit. Mot. to Strike at 2. Plaintiffs argue that Flanagan's deposition testimony, which confirms that he and Smith overlapped at Ergo for only weeks, contradicts Flanagan's statement in the affidavit that "Twila Smith never complained to [him] about sexual harassment." Flanagan Aff. ¶ 4; <u>see</u> Mot. to Strike at 5–7. But there is nothing contradictory about Flanagan's employment beginning near the end of Smith's employment at Ergo and his statement that Smith never complained to him about sexual harassment. Flanagan was not asked directly during his deposition whether Smith ever complained of sexual harassment. But he was asked whether "there were any . . . complaints of sexual harassment [in addition to three complaints, including Smith's, filed with the Equal Employment Opportunity Commission ("EEOC")] filed [at] Ergo Solutions . . . between the time you joined Ergo Solutions and the end of 2012," and he responded that he did not "recall any," Flanagan Dep. 11:6–22, which is consistent with his statement that Smith never complained to him about sexual harassment. Flanagan's statements in his affidavit do not contradict his prior sworn testimony, and hence the Court will not strike the Flanagan affidavit.

Unsworn declarations are permitted by the Local Civil Rules, defendants were not required to disclose the affidavits during discovery, and Flanagan's affidavit does not contradict his sworn

testimony. Hence the Court concludes that plaintiffs' arguments are without merit, and the motion to strike will be denied.

## II.      The Parties' Cross-Motions for Summary Judgment

Smith and Osborne each bring two claims related to alleged harassment by Brownlee and Fairclough: one for quid pro quo and hostile work environment sexual harassment under Title VII, and one for quid pro quo and hostile work environment sexual harassment under the DCHRA. While the Title VII claim is brought against only Ergo, the DCHRA claim is brought against Ergo and against Brownlee in his individual capacity. Plaintiffs and defendants each move for summary judgment on all claims, and Ergo additionally moves for summary judgment on the affirmative defense to employer liability articulated in <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775 (1998). For the reasons that follow, the Court will deny plaintiffs' motion and grant in part and deny in part defendants' motion.

Section 703(a) of Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To bring a claim for sexual harassment under Title VII, a plaintiff must show that (1) he or she was a member of a protected class; (2) the alleged harasser subjected the plaintiff to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment altered the plaintiff's compensation, terms, conditions, or privileges of employment; and (5) the employer may be held liable. <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993) (citing <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 63–64 (1986)); <u>Curry v. District of Columbia</u>, 195 F.3d 654, 659 (D.C. Cir. 1999); <u>Leach v. Nat'l R.R. Passenger Corp.</u>, 128 F. Supp. 3d 146, 154 (D.D.C. 2015) (citing <u>Davis v. Coastal Int'l Sec., Inc.</u>, 275 F.3d 1119, 1122–23 (D.C. Cir. 2002)). "Courts describe an explicit alteration [of employment terms] as 'quid

pro quo' harassment and a constructive alteration as 'hostile work environment' harassment."
Curry, 195 F.3d at 659 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998)).  In order for a hostile work environment claim to be actionable, the conduct "must be severe or pervasive."  Id.

Similarly, under the DCHRA, employers may not "discriminate against any individual, with respect to [her] compensation, terms, conditions, or privileges of employment," "wholly or partially for a discriminatory reason based upon the [individual's] actual or perceived . . . sex."  D.C. Code § 2-1402.11(a), (a)(1).  A cause of action for sexual harassment under the DCHRA "mirrors Title VII."  Smith v. Café Asia, 256 F.R.D. 247, 251 (D.D.C. 2009) (citing Howard Univ. v. Best, 484 A.2d 958, 981 (D.C. 1984)).  To prevail under the DCHRA, a plaintiff must demonstrate "(1) that [s]he is a member of a protected class; (2) that [s]he was subject to unwelcome harassment; (3) that the harassment occurred because of h[er] membership in the protected class; and (4) that the harassment was severe enough to affect a term or condition of h[er] employment."  Id.

An employer will be vicariously liable for a supervisor's sexual harassment that results in a tangible employment action (i.e., quid pro quo harassment).  Penn. State Police v. Suders, 542 U.S. 129, 137 (2004); Ellerth, 524 U.S. at 760–61.  However, "[a]n employer's liability for a hostile work environment sexual harassment claim differs depending on who does the harassing."  Curry, 195 F.3d 659.  "[A] negligence standard governs employer liability for a co-worker's harassment," and "[a]n employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action."  Id. at 659–60.  On the other hand, if the alleged harasser is "a supervisor or someone else whose position in the workplace

affords authority over the target of the harassment," a vicarious liability standard applies. Id. at 659. This vicarious liability for a supervisor's creation of a hostile work environment is "subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of a plaintiff victim." Faragher, 524 U.S. at 780. The Faragher defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807. "While the reasonableness of an employee's response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the negligence standard, where she bears the burden of establishing her employer's negligence, than under the vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence." Curry, 195 F.3d at 660.

The first element of a sexual harassment claim—that a plaintiff is a member of a protected class—"may be demonstrated by a simple stipulation of the employee's gender." Best, 484 A.2d at 978. Similarly, the third element—that harassment occurred because of one's protected status— is satisfied in a sexual harassment case in which, "[b]ut for her womanhood[, the plaintiff's] participation in sexual activity would never have been solicited," Bundy v. Jackson, 641 F.2d 934, 942 (D.C. Cir. 1981), or "the harasser is motivated by sexual desire," Smith, 256 F.R.D. at 252. See also Best, 484 A.2d at 979 (stating that "where a male supervisor makes sexual overtures to a female worker, it is clear that the harassment is based on a prohibited criterion"). The parties dispute neither that the plaintiffs qualify as members of a protected class as women nor that the alleged harassment complained of by both Smith and Osborne, if indeed harassment, would not have occurred but for their gender. Hence, the core dispute in this case centers on the three

remaining elements: whether plaintiffs were subject to unwelcome sexual harassment; whether the harassment altered the terms of their employment, under either a quid pro quo or hostile work environment theory; and whether Ergo may be held liable.

Plaintiffs argue that there is no genuine issue of material fact because the evidence proves that Brownlee's conduct was unwelcome, severe, and pervasive; that this conduct altered the terms and conditions of their employment; that a reasonable person would find the conduct offensive; and that their employer knew of the conduct but failed to take remedial action. Pls.' Mot. at 5–40. Defendants counter that while plaintiffs have demonstrated that they engaged in a sexual relationship with Brownlee, they have failed to present evidence to support a conclusion that Brownlee's conduct was unwelcome. Defs.' Opp'n & Mot. at 28. Neither party explicitly addresses the harassment committed by Fairclough, though both seek summary judgment on all claims, which include allegations about Fairclough's conduct.

Because Fairclough and Brownlee served as co-employee and supervisor, respectively, to Smith and Osborne, their conduct will be considered under different standards. Thus, the Court will consider the claims related to each alleged harasser separately. For the reasons that follow, the Court concludes that Fairclough's harassment of Osborne is not actionable under Title VII or the DCHRA because Osborne has proffered no evidence that Ergo's corrective action in response to her complaint about Fairclough was defective in any way. The Court determines that the record also does not support Osborne's quid pro quo theory of sexual harassment because she has proffered no evidence that she suffered a tangible employment action. Nevertheless, whether viewed in the light most favorable to plaintiffs or defendants, genuine issues of material fact remain as to Smith's hostile work environment claim based on Fairclough's conduct, both plaintiffs' hostile work environment claims based on Brownlee's conduct, and Smith's quid pro quo claims

18

based on Brownlee's conduct. These remaining issues preclude granting summary judgment to plaintiffs or defendants on these claims.

### A. Claims Related to Fairclough's Harassment of Smith and Osborne

Both Smith and Osborne allege that Fairclough engaged in repeated, unwanted harassing behavior, including touching, grabbing and rubbing against plaintiffs; repeatedly making sexual remarks; propositioning plaintiffs for sex; attempting to kiss Osborne; and sending a picture of his penis to Smith's phone. Smith Dep. at 171:20–176:17; Smith's Interrog. Resps. at 6; Osborne Dep. at 114:5–116:22. Fairclough's harassment of Smith began in 2008 and continued throughout her employment. Smith Dep. at 171:20–172:16. Fairclough sexually harassed Osborne over a period of several months in 2010. Osborne Dep. at 112:22–114:4.

Whether construed in the light most favorable to plaintiffs or defendants, Smith's and Osborne's accounts of events involving Fairclough stand unchallenged. In fact, defendants come very close to conceding that Fairclough sexually harassed Osborne before Fairclough was transferred to another work site. See Defs.' Statement of Undisputed Facts ¶ 84 ("Osborne admits that when Faircloth [sic] was moved to Specialty Hospital, his sexual harassment stopped."). Defendants do not address Fairclough's conduct in their summary judgment briefs except to argue that the "thrust of [Osborne's] lawsuit against Ergo is not really with respect to Mr. Faircloth [sic], rather it is against George Brownlee." Defs.' Opp'n & Mot. at 23. Because defendants have offered no evidence to dispute Smith's and Osborne's descriptions of Fairclough's conduct toward them, the Court accepts Smith's and Osborne's accounts of Fairclough's conduct for purposes of summary judgment.

Applying the legal standard for hostile work environment sexual harassment under Title VII and the DCHRA,[13] the Court concludes that Fairclough subjected Smith and Osborne to sexual harassment (including unwanted touching, sexual innuendo, requests for sex, and sending a sexually explicit image). Defendants do not dispute that Fairclough's advances were unwelcome as to both Smith and Osborne.

The Court also concludes that there is sufficient evidence that Fairclough's conduct was severe or pervasive. In determining whether harassment is "severe or pervasive," courts look to "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008). Courts also consider whether the conduct "is physically threatening or humiliating, or a mere offensive utterance." Harris, 510 U.S. at 23. Here, Fairclough engaged in a pattern of sexually harassing behavior that was frequent and of long duration—from approximately 2008 until Fairclough's transfer in 2010. The conduct also physically interfered with plaintiffs' work performance; for example, Fairclough positioned himself so that plaintiffs would have to rub against him to perform their job duties. Smith Dep. at 176:14–17; Osborne Dep. at 114:5–12; 116:16–22. And plaintiffs have provided unrebutted testimony that Fairclough's harassing conduct extended to other women at the worksite as well. Smith Dep. at 177:1–177:9. The totality of the circumstances leads the Court to conclude that Fairclough's harassment of both Smith and Osborne was severe and pervasive.

Because Fairclough was plaintiffs' co-worker rather than supervisor, a negligence standard applies, and Ergo may only be held liable for Fairclough's conduct if the company "knew or should

---

[13] Because Fairclough was a co-worker and neither Smith nor Osborne alleges that Fairclough's harassment resulted in an adverse personnel action against them, the Court construes the claims related to Fairclough as hostile work environment claims.

have known of the harassment and failed to implement prompt and appropriate corrective action." Curry, 195 F.3d at 660. Smith and Osborne "bear[] the burden of establishing [their] employer's negligence." Id.

With respect to Smith's claims related to Fairclough, it is undisputed that no corrective action was taken against Fairclough until late 2010, months after Ergo terminated Smith. The key issue, then, is whether Ergo knew or should have known of Fairclough's conduct towards Smith. Smith testified that she complained repeatedly about Fairclough's behavior to her supervisor, Cawley, which, if true, would have put Ergo on notice of Fairclough's conduct. See Smith Dep. at 172:2–21. However, Cawley testified that Smith never complained to him about any type of sexual harassment, nor was he made aware of any sexual harassment in the workplace. Cawley Dep. at 12:12–22. Whether Smith in fact complained to Cawley (or another Ergo representative sufficient to put Ergo on notice of Fairclough's sexual harassment towards Smith) is a material disputed fact, and summary judgment must be denied on this claim.

However, Osborne cannot prove, as a matter of law, that Ergo was negligent in relation to her complaints against Fairclough. The parties do not dispute that Osborne complained to Brownlee about Fairclough's conduct, that Ergo transferred Fairclough because of her complaint, and that Fairclough's harassment ceased after the transfer. Osborne Dep. at 120:14–126:18; Defs.' Statement of Undisputed Facts ¶ 84. Osborne's testimony establishes both that Ergo (via Brownlee) knew about the harassment and that Ergo then took corrective action (transfer of Fairclough), which effectively stopped the harassment. Osborne has not argued that this corrective action was incomplete or that it was not prompt. On these facts, then, Osborne does not satisfy her burden to show that Ergo was negligent in responding to Fairclough's sexual harassment

towards her, and Ergo cannot be held liable for Fairclough's conduct towards Osborne under either Title VII or the DCHRA.

### B. Claims Related to Brownlee's Alleged Harassment of Smith and Osborne

Because it is undisputed that plaintiffs are members of a protected class and that any sexual harassment they suffered would have been a result of their protected status, in order to be entitled to summary judgment on their claims against Brownlee they must prove: (1) that the harassment was unwelcome; (2) that the harassment altered the terms of their employment, under either a quid pro quo or hostile work environment theory; and (3) that Ergo may be held liable under Title VII and the DCHRA or that Brownlee may be held liable individually under the DCHRA. The Court finds that genuine issues of material fact exist with respect to most, but not all, elements of plaintiffs' claims based on Brownlee's conduct. For the reasons that follow, then, the Court will deny plaintiffs' motion and grant in part and deny in part defendants' motion.

### 1. Whether Harassment Was Unwelcome

The parties agree that both Smith and Osborne engaged in physical relationships with Brownlee but disagree as to whether these relationships were unwelcome and therefore violative of Title VII and the DCHRA. See Pls.' Mot. at 11–12, 31–32; Defs.' Opp'n & Mot. at 2–4, 21–24. Plaintiffs' deposition testimony supports their contentions that Brownlee's sexual advances were unwelcome. Smith testified in her deposition, for example, that she tried to avoid being alone with Brownlee at work, Smith Dep. at 64:11–16; that she tried to pull his hands away from her body when he touched her, id. at 93:18–95:7, 100:1–12; and that she told him to stop contacting her, id. at 125:2–21. Osborne testified that she stopped returning Brownlee's calls and texts, Osborne Dep. at 77:6–9; that she asked Brownlee to stop (or leave) on several occasions, id. at 52:8–53:11, 69:21–71:4; and that she felt pressured to submit to his requests because of his

supervisory authority, <u>id.</u> at 73:16—76:14. Both plaintiffs also testified that they complained repeatedly to supervisors and others about Brownlee's conduct. Smith Dep. at 75:14–77:13, 79:11–17, 80:9–81:4, 81:11–82:4; Osborne Dep. at 94:7–20, 128:6–16, 133:10–19, 135:14–136:12.

In contrast, defendants highlight instances of conduct by plaintiffs that tend to suggest that plaintiffs engaged in their relationships with Brownlee voluntarily. For example, Smith admitted to sending pictures of a suggestive nature to Brownlee, Smith and Brownlee engaged in mutual touching in a restaurant that required intervention by restaurant staff, and Smith went out to a nightclub with Brownlee and danced for an hour before both got into the back seat of her car. Defs.' Opp'n & Mot. at 21–22. As for Osborne, defendants note that she let Brownlee into her locked apartment at night three times for sex. <u>Id.</u> at 23. She also sent a picture of herself in a bikini in response to a picture of his penis that he sent to her phone. <u>Id.</u> at 23–24. Defendants contend that these are voluntary activities that do not suggest coercion. <u>Id.</u> at 24.

Defendants further note that no one at Ergo corroborates plaintiffs' allegations that they complained of harassment. <u>Id.</u> at 2. Defendants add that the Hartman Report involved a detailed investigation of two complaints known to Hartman at the time, yet the report contains no mention of Smith's alleged complaints, which may have occurred, if at all, before the report was written. <u>Id.</u> at 27. Because Ergo could have just as easily investigated three complaints as two, defendants contend that it is more likely that Smith never complained. <u>Id.</u> Instead, defendants characterize Smith and Osborne as jilted lovers who are disappointed that Brownlee discontinued his affairs with them. <u>Id.</u> at 1.

Viewing the evidence and all permissible inferences in the light most favorable to plaintiffs, Brownlee's conduct was unwelcome. However, viewing the evidence and all

permissible inferences in the light most favorable to defendants, Brownlee's relationships with Smith and Osborne were welcomed and consensual. Because the parties have presented admissible, contradicting evidence on whether Brownlee's conduct was unwelcome and, relatedly, whether Smith or Osborne complained about Brownlee's conduct, the Court concludes that genuine issues of material fact exist as to this element.

## 2. Whether Harassment Altered Terms, Conditions, or Privileges of Plaintiffs' Employment

The parties also dispute whether the alleged harassment altered the terms of their employment. Plaintiffs' briefs do not clearly delineate between their quid pro quo or hostile work environment theories of harassment, stating only that Brownlee's conduct "altered the terms, conditions, and privileges of [their] employment." Pls.' Mot. at 34–37. However, they allege both quid pro quo and hostile work environment theories of discrimination in their complaint, and their briefs at least allude to each type of claim. Thus, the Court will consider each theory in turn.

### a. Quid Pro Quo Harassment

Quid pro quo sexual harassment occurs when "a tangible employment action result[s] from a refusal to submit to a supervisor's sexual demands." Ellerth, 524 U.S. at 753. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. When a claim "involves only unfulfilled threats," it alleges a hostile work environment, not quid pro quo harassment. Id. at 754.

Under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "once the plaintiff has made out a prima facie case [of discrimination]," the employer "bears the burden of producing a non-discriminatory explanation for the challenged personnel

action." Ford v. Mabus, 629 F.3d 198, 201 (D.C. Cir. 2010) (citing McDonnell Douglas, 411 U.S. at 802–03). If the employer satisfies this burden, then the burden shifts back to the plaintiff, who "bears the ultimate burden of proving that discriminatory animus was the determining or but-for cause of the personnel action." Id. However, the United States Court of Appeals for the District of Columbia Circuit directs that "where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008). Instead,

> in considering an employer's motion for summary judgment[,] . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?

Id.

Defendants argue that plaintiffs have presented no evidence to support their quid pro quo claims. Defs.' Opp'n & Mot. at 24. The Court is inclined to agree as to Osborne but not as to Smith. After a close review of the record, the Court finds no evidence that Osborne suffered a tangible employment action because of Brownlee's alleged sexual harassment. Osborne testified that she quit Ergo to take a better paying job. Osborne Dep. at 142:11–143:19. As a matter of law, Osborne therefore has not made out a prima facie case for quid pro quo sexual harassment. See Adesalu v. Copps, 606 F. Supp. 2d 97, 103 (D.D.C. 2009) (noting that, notwithstanding Brady, "the Court still first must determine whether plaintiff has suffered an adverse employment action").

Smith, however, did suffer tangible employment actions. She was suspended for a week without pay in April or May 2010 then was terminated in July 2010. Smith Dep. at 18:4–14,

125:22–126:6.  Ergo contends that its suspension and termination of Smith were not pretextual. Defendants contend that Smith was a problem employee who was suspended and terminated for practicing occupational therapy from September 2009 to March 2010 without a valid license. Defs.' Opp'n & Mot. at 2; Defs.' Statement of Undisputed Facts ¶¶ 29–32, 34, 52; <u>see also</u> Smith Dep. at 125:22–127:15 (admitting that her license had expired and that Ergo told her that it was suspending her for that reason).  Smith's termination letter further noted that Smith had failed to document patient notes on time, had practiced occupational therapy without a license in violation of District of Columbia regulations, and had exhibited unprofessional behavior to a supervisor. Letter from Richard C. Flanagan to File (July 27, 2010) ("Termination Letter"), Ex. 12 to Defs.' Opp'n & Mot. [ECF No. 100-13] at 1–2.  The letter concluded by stating that the Personnel and Compensation Committee had determined at its weekly meeting that Smith should be terminated. <u>Id.</u> at 2.  Because Ergo has asserted legitimate, non-discriminatory reasons for Smith's suspension and termination—primarily that she had practiced occupational therapy without a valid license for more than six months—the Court concludes that a reasonable jury could find the employment actions were non-pretextual, and the burden shifts back to Smith.  The question before the Court, then, is whether she has produced sufficient evidence for a reasonable jury to find that she was suspended and/or terminated because of intentional discrimination and not because of Ergo's asserted non-discriminatory reasons.

The Court concludes that Smith has satisfied this burden.  Smith acknowledges that she was suspended for a week without pay "supposedly for letting [her occupational therapy] license expire."  Smith Dep. at 125:22–126:10.  Smith explains, however, that the expiration of her license in September 2009 was addressed and corrected promptly in March 2010, a month or more before the suspension.  <u>Id.</u> at 126:11–129:2.  Brownlee allegedly propositioned her for sex (and she

declined) only a week before the suspension, and Smith believes this is the actual cause for her suspension.  Id. at 125:2–126:4.  As to her termination, Smith argues that "she was terminated from Ergo because she complained to various management officials verbally about Mr. Brownlee's harassment."  Pl.'s Opp'n to Def[s.'] Mot. for Summ. J. [ECF No. 103] at 21.  She describes the unusual circumstances of her termination as evidence that the reasons given were pretextual. Flanagan, the human resources director, provided her with a new contract to sign when her contract was up for renewal, and she asked for time to review the new contract.  Smith Aff. ¶ 19.  Later that same day, Flanagan and Smith's immediate supervisor "called [her] back in" and "informed [her] that [her] performance was not good and that [she] had failed to be productive."  Id.  Her employment was then terminated, "allegedly for poor performance."  Id.  This account of events may conflict with that in Ergo's Termination Letter, which states that the decision to terminate Smith was made at a weekly Personnel and Committee meeting.[14]  See Termination Letter at 2. Both Flanagan and Brownlee were also members of the Personnel and Compensation Committee at the time of Smith's termination.  30(b)(6) Dep. at 127:11–128:11.  Their presence on the committee means that Flanagan likely would have been aware of the outcome of any such meeting—and therefore would not have offered a contract renewal if the decision to terminate had already been made—and that the decision of the committee meeting was not insulated from the influence of Brownlee, Smith's alleged harasser.  A reasonable jury could infer from these facts that Ergo's reasons for suspending and terminating Smith were pretextual.  Cf. Carter v. George Washington Univ., 387 F.3d 872, 880 (D.C. 2004) (noting a lack of evidence of pretext where, inter alia, a person alleged to have had discriminatory intent against plaintiff "was not a decision-

---

[14] The record does not reveal when the weekly meeting occurred, so it is possible that the meeting occurred between Smith being offered a renewal contract and her termination.

maker at the committee level" where allegedly discriminatory employment decisions were made (emphasis added)).

Under these circumstances, a reasonable jury could find that Ergo's purported reasons for suspending and terminating Smith were pretextual and that Smith suffered intentional discrimination, or it could find Ergo's non-pretextual account of events persuasive. Accordingly, summary judgment for either side on Smith's quid pro quo harassment claim related to Brownlee's alleged conduct is unwarranted.

### b. Hostile Work Environment Harassment

A claim for hostile work environment sexual harassment arises when discriminatory conduct is so severe or pervasive in a workplace that it creates "[a] discriminatorily abusive work environment" that "detract[s] from employees' job performance, discourage[s] employees from remaining on the job, or keep[s] them from advancing in their careers." Harris, 510 U.S. at 22. Unlike the standard for quid pro quo sexual harassment, a plaintiff need not prove that a tangible employment action occurred; even unfulfilled threats may be actionable if they are sufficiently severe or pervasive. Ellerth, 524 U.S. at 754.

Here, both Smith and Osborne allege that Brownlee's sexually harassing conduct created a hostile work environment. As for Smith, Brownlee admits that he touched and grabbed parts of Smith's body on many occasions, that he sent an image of his penis to Smith's cell phone, and that they masturbated in each other's presence in the back of Smith's car. Brownlee Dep. at 37:1–16, 38:5–9; Defs.' Statement of Undisputed Facts ¶¶ 24–25. As for Osborne, Brownlee concedes that he had sexual intercourse with Osborne three times at her home and that Osborne manually stimulated his penis in a movie theater. Defs.' Statement of Undisputed Facts ¶¶ 88, 91–93, 95, 96. Additional allegations of Brownlee making sexual advances are disputed, including Smith's

allegation that he tried to kiss her in a stairwell during a work-related conference, compare Smith Dep. at 56:9–59:4, with Brownlee Dep. at 38:10–15, 44:4–5; and Osborne's allegation that Brownlee summoned her to a room at an Ergo facility and performed sex acts on her, compare Osborne Dep. at 61:5–62:21, with Brownlee Dep. at 53:5–8.

Because these events go to Smith's and Osborne's hostile work environment claims, the first question on summary judgment is whether this conduct was "severe or pervasive" and thus actionable under Title VII and the DCHRA. Curry, 195 F.3d at 659. As noted above, courts look to "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance," Baloch, 550 F.3d at 1201, as well as whether the conduct "is physically threatening or humiliating, or a mere offensive utterance," Harris, 510 U.S. at 23.

As to frequency, Brownlee's advances were undisputedly frequent as to each plaintiff, involving repeated communications and instances of intimate contact. See, e.g., Smith Dep. at 62:10–64:16, 75:2–10; Osborne Dep. at 62:14–21; Brownlee Dep. at 36:5–38:9, 49:12–51:6. As to severity, Brownlee admits to touching intimate areas of Smith's body and having sexual intercourse with Osborne. Brownlee Dep. at 37:1–7, 51:4–6. Even if the Court were to consider only these incidents, which the parties agree occurred, these actions would be sufficiently severe or pervasive to have created a hostile work environment if they were unwelcome. See EEOC Policy Guidance on Current Issues of Sexual Harassment, No. N-915-050, 1990 WL 1104701, at *10 (Mar. 19, 1990) (noting that the EEOC presumes "that the unwelcome, intentional touching of a charging party's intimate body areas is sufficiently offensive to alter the condition of her working environment and constitute a violation of Title VII").

However, as explained above, there is a genuine issue of material fact as to whether Brownlee's conduct was unwelcome. The Court concludes that if this conduct were to be found wholly unwelcome, then it would also be severe and/or pervasive as a matter of law. Conversely, if Brownlee's actions were welcomed, then they would not be severe or pervasive. And if Brownlee's actions were found to be received differently at different times—for example, if some instances of touching or sexual contact were welcomed, but others were not—this would shift the totality of the circumstances so as to require a fresh appraisal of whether the conduct was severe or pervasive. Because this element cannot be fully analyzed without a determination of whether Brownlee's conduct was unwelcome—an issue that remains in genuine dispute—neither party is entitled to summary judgment on the hostile work environment claims.

### 3. Ergo's Liability for Brownlee's Alleged Conduct[15]

Because of Brownlee's supervisory role over Smith and Osborne, Ergo will be considered vicariously liable for his actions unless it can prove two elements of an affirmative defense under Faragher: "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. "[P]roof that an employer had promulgated an antiharassment policy with complaint procedure" is relevant to the first prong of the defense, "while proof that an employee . . . unreasonabl[y] fail[ed] to use any complaint procedure provided by the employer

---

[15] As noted in this Court's March 30, 2015, opinion, because "the Faragher defense goes to vicarious liability, it is not available [on the DCHRA claims] to Brownlee . . . , who [is] alleged to have perpetrated discrimination [himself] directly." Smith, 306 F.R.D. at 64 n.7.

. . . will normally suffice to satisfy the employer's burden under the second element of the defense." Id. at 807–08.

Ergo claims that, under Faragher, it should not be deemed vicariously liable for Brownlee's conduct because defendants had a sexual harassment policy, plaintiffs knew of that policy, and defendants allege that plaintiffs did not complain under that policy. Defs.' Opp'n & Mot. at 21. However, summary judgment is inappropriate in Ergo's favor on its Faragher defense because there is a genuine issue of material fact as to whether the company's sexual harassment policy was bona fide and whether plaintiffs complained—or were reasonable in failing to complain—under the policy.

It is undisputed that Ergo had a written sexual harassment policy beginning in 2007 and that Ergo employees were made aware of the policy. See 3d Am. Compl. ¶ 40 (noting that Smith knew about sexual harassment policy). But having a policy is not the same as enforcing a policy. Ergo's human resources director testified in his deposition that he observed "inappropriate behavior on a professional level" that amounted to "a form of sexual harassment" occurring at Ergo between 2007 and 2010, notwithstanding the existence of this policy. Warren Dep. at 47:7–10. Furthermore, the investigator of two other sexual harassment complaints at Ergo in 2010 concluded that "[c]learly, principals have felt little or no compunction about having operated outside the scope of Ergo's guidelines policies," and hence "strongly recommend[ed] that Ergo revise its current sexual harassment policy" to be clear that Ergo would not tolerate sexual harassment in the workplace. Hartman Report at 7–8. Plaintiffs contend that this investigation demonstrates that Ergo's sexual harassment policy was not enforced and that sexual harassment was rampant at Ergo. See Pl[s.'] Counterstatement of Undisputed Material Facts [ECF No. 104]

at 8–11. In contrast, Ezeani characterizes the report as evidence that Ergo took complaints very seriously because it shows that the company investigated complaints. Ezeani Aff. ¶ 6.

The bare assertion that an employer had a written sexual harassment policy, taken alone, cannot satisfy as a matter of law <u>Faragher</u>'s first prong—which requires that an employer have "exercised reasonable care to prevent and correct promptly any sexually harassing behavior"— when other testimony suggests that the policy was not being enforced. <u>Faragher</u>, 524 U.S. at 807. As to the second prong, plaintiffs testified that they repeatedly complained about Brownlee's conduct to their direct supervisors, another Ergo owner, and Ergo's human resources director. Smith Dep. at 75:14–77:13, 79:16–21, 80:9–81:4, 81:11–82:4; Osborne Dep. at 94:7–20, 128:6– 16, 133:10–20, 135:14–136:12. If plaintiffs' alleged complaints actually occurred, Ergo would not be entitled to the <u>Faragher</u> defense. Furthermore, even if plaintiffs had failed to complain, in light of the conditions at Ergo, plaintiffs' beliefs that complaining would be futile and likely to lead to retaliation may not have been unreasonable. Viewing the evidence and permissible inferences in a light most favorable to Smith and Osborne, then, Ergo's sexual harassment policy existed in name only and plaintiffs either complained or reasonably decided not to complain. Hence, summary judgment in Ergo's favor on its <u>Faragher</u> defense will be denied.

## **CONCLUSION**

For the reasons set forth above, plaintiffs' motion to strike and motion for summary judgment will each be denied. Defendants' motion for summary judgment will be granted in part and denied in part. The Court finds that Ergo was not negligent as to Fairclough's sexual harassment of Osborne as a matter of law and that Osborne has not proffered sufficient facts to support a quid pro quo theory of sexual harassment under Title VII or the DCHRA. However, genuine issues of material fact persist as to plaintiffs' other theories of liability, which preclude

summary judgment.  Smith may still proceed with her claims under Title VII and the DCHRA for hostile work environment sexual harassment based on Fairclough's conduct and quid pro quo and hostile work environment sexual harassment based on Brownlee's conduct.  Osborne may proceed with her claims under Title VII and the DCHRA for hostile work environment sexual harassment based on Brownlee's conduct.

A separate order will issue on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>January 9, 2019</u>